Albert D. CHESSER, Jr.,
Plaintiff–Appellee,

v.

STATE OF ILLINOIS, a State within the United States of America; Illinois State Police, an agency of the State of Illinois; Dwight E. Pittman, Superintendent of the Illinois State Police, Defendants–Appellants.

No. 88–2127.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 26, 1989.

Decided Feb. 6, 1990.

Chester L. Blair, Phyllis Russell (argued), Blair, Russell & Cole, Chicago, Ill., for plaintiff-appellee.

Deborah L. Ahlstrand, Asst. Atty. Gen., Office of the Attorney General, Jennifer A. Keller (argued), Chicago, Ill., for defendants-appellants.

Before COFFEY and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

This is a tale of two troopers. Albert Chesser and David Deason were both employed as rookies in that office by the State of Illinois in October, 1975. Chesser was black; Deason, white. Their careers progressed along similar, but not identical, paths. At the State Police Academy Chesser received "satisfactory" ratings and graduated 19th out of an entering class of 45 persons. Deason received slightly higher ratings and graduated 4th. Following graduation from the Academy Chesser was sent to Chicago to complete a one year "probationary employment" period with an extended stint of field training.[1] Deason was assigned to complete his probationary period in central Illinois. The work of both men during this period left something to be desired. Chesser's supervisors found his performance deficient in many respects: among other things he was unable to accept criticism and he was unaware of potential on-the-job hazards; he had poor driving habits, poor relations with the public, poor report writing, poor radio communications, poor judgment, and a faulty court record. Deason's supervisors thought little better of him: he was unable to accept criticism, unable to write reports, and unable to maintain a stable personality; he had poor driving habits, poor relations with the public, poor court behavior, and an apparent problem with alcohol. The two troopers' evaluations reflected upon them to such an extent that toward the end of their probationary employment they were seen as similarly unfit for service in the Illinois State Police ("ISP"). Chesser's district commander recommended on September 16, 1976 that Chesser be terminated. Deason's district commander made a similar recommendation on October 7, 1976 for Deason.

The ISP invests a good deal of time and money in its probationary troopers. Thus, before one is fired (and the investment written off) it is common for the ISP to hold a review hearing in which certain officials have a chance to deliberate on the proposed firing. The holding of such a hearing during the period of Chesser and

---

**1.** Rookie state troopers were appointed subject to a twelve-month probationary period. For the first five months or so of this period the troopers trained at the State Police Academy. Those who successfully passed this training graduated to field work, heavily supervised, for the remaining seven months.

Deason's employment followed a standard procedure: Upon receiving a district commander's recommendation that a probationary trooper be terminated the Superintendent of Police—who had full discretionary authority to fire probationary troopers—would call a meeting. The meeting was not statutorily mandated; it was held only for the enlightenment of the Superintendent. He would summon for the meeting the trooper, the trooper's district and area commanders, the field operations and the staff services deputy superintendents, and, possibly, one person from the personnel department. At the meeting all persons but the trooper would get together and review the trooper's personnel file. The district commander would begin discussing the trooper's employment history and other panel members would question him about the trooper's work. The trooper then would be asked to join the meeting. He would be questioned about his work by members of the panel, and he would be given an opportunity to address the contents of his file and proffer explanations or defenses to any negative comments included therein. After sharing his remarks the trooper would leave the meeting and further discussion between the panel members would ensue; they would comment on the trooper's responses to their questions and the file's criticisms. The Superintendent would listen to the discussion and, at an appropriate moment, ask the panel members to take a position on the trooper's employment. Starting with the district commander, and continuing to the area commander, the field operations deputy superintendent, and the staff services deputy superintendent, each panel member would make a recommendation to the Superintendent and then defend or justify his recommendation. Having reviewed the trooper's file, listened to the trooper's comments, and obtained the group members' recommendations, the Superintendent would exercise his authority and either terminate the trooper or extend his employment.

Chesser and Deason had their review hearing on the same day: October 8, 1976. For Deason, standard procedure was followed. Dwight Pittman, the Superintendent of Police, presided over the meeting. He was joined by Deason's district and area commanders, the field operations and the staff services deputy superintendents, and a representative from personnel. Deason's file was reviewed and panel members made comments on the entries. Deason was invited in. He spoke in his own behalf, fielding questions, discussing entries in his file, and providing a defense to various criticisms leveled against him. After he left, the remaining group canvassed his case again, and came to the conclusion that Deason, if given a chance, would probably improve his performance and develop into an acceptable state trooper.[2] The panel recommended that Deason's probationary employment be extended six months. Pittman concurred in the group's recommendation, and Deason's employment was extended.

Chesser's review was different from the norm, both in process and result. Chesser was informed at 1:30 in the morning of October 8, by radio dispatch, that he was wanted for a meeting at a location approximately four hours away by 9:00 that same morning. This time frame left him no opportunity to sleep before the meeting. As he was not informed of the purpose for which the meeting was being held, he had no reason to review his personnel file or prepare a defense of his performance. Thus, once at the meeting he was caught unprepared. And while there he was denied the opportunity to freely defend himself; his participation was limited simply to answering the specific questions of his inquisitors. Of these persons there were an extraordinary number—about eight. This group, unusual in its size, was also unusual in its composition. Included among those unusually present was one of Chesser's

---

2. Included in this group was Deason's district commander, who had originally recommended Deason's termination. Apparently his conviction to terminate Deason had never been strong, and at the meeting he found himself persuaded that, given a little more time, Deason could be "salvaged."

field-training supervisors, a supervisor who previously had evaluated Chesser in a less than glowing light. And absent among those usually present was the ultimate decision-maker, Pittman, who for some unknown reason chose not to give Chesser the benefit of a personal review. Not surprisingly, Chesser was unable to dissuade the review group from recommending his termination. This recommendation was communicated to Pittman who, not surprisingly, accepted it. About a week after the meeting Chesser was fired.

Chesser later learned that Deason had been given a second chance by the ISP with a six month extension of his probationary period. This news left him somewhat miffed, as he felt his record was at least as good as Deason's. He filed a complaint on January 3, 1977 with the Equal Employment Opportunity Commission charging that the ISP had fired him and kept Deason because of race. The EEOC began an investigation, with which the ISP refused to fully cooperate. Despite this, the EEOC managed to collect enough evidence to conclude, by October 30, 1980, that reasonable cause existed to believe that Chesser's firing was race related. It then began an effort to bring the parties to a conciliatory agreement, but this effort failed. In the meantime the Civil Rights Division of the U.S. Department of Justice had been invited to prosecute Chesser's case. After completely reviewing his EEOC file Justice declined the invitation to prosecute. Subsequent thereto on March 29, 1982, Chesser received a right to sue letter, the advice of which he promptly followed.

Chesser filed suit against the State, the ISP, and Pittman, claiming, among other things, that they violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17. In federal court his case progressed to a bench trial. Chesser argued to the judge that he and Deason were similarly situated as far as their qualifications for state trooper were concerned, and he pointed to their written evaluations as proof on this point. He then maintained that he had been treated differently than Deason—he had been fired while Deason had not—simply because of his race. To bolster this point he introduced evidence relating to the disparate treatment afforded him and Deason at the review hearings. The defendants argued to the contrary, claiming that Chesser was fired because of his work. They asserted that written evaluations of his work performance and the testimony of Pittman and others made it clear that Chesser was fired not because of his race, but because his qualifications were less than Deason's and below those necessary for the job of Illinois state trooper.

After hearing the evidence the district court concluded that Chesser had established a prima facie case under Title VII, giving rise to a presumption of race discrimination on the part of the defendants. The defendants, in turn, had successfully rebutted that presumption by articulating a legitimate, nondiscriminatory reason for Chesser's discharge: that his record was inferior to Deason's and his qualifications were too low to justify an extension of his probationary period. Although this articulation was enough to overcome the presumption of race discrimination, in the court's view it was not enough to overcome the evidence of race discrimination that came to light during the trial.[3] Besides the

---

**3.** In the normal Title VII case, both sides put on proof and the district court determines later if each side has met the burdens imposed upon it by law. In a Title VII case alleging discriminatory treatment, such as this one, those burdens are as follows: First, the plaintiff must establish by a preponderance of the evidence proof creating a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Upon the establishment of such a case, an inference of discrimination is raised. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98

S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). At this stage the court will presume "that the employer's actions, if unexplained, were more likely than not the result of impermissible factors." *Andre v. Bendix Corp.*, 841 F.2d 172, 175 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 144, 102 L.Ed.2d 116 (1988). Facing such a case, the defendant must explain its actions or lose; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); thus, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the plaintiff's disparate treat-

normal evidence supporting Chesser's prima facie case,[4] this evidence consisted of proof that Chesser did not receive a review hearing comparable to that afforded Deason. The court found that the treatment Chesser received at the hands of Pittman and his review board was "markedly different" (in a prejudicial manner) from the treatment Deason received. Moreover, the motivation behind this different treatment was Chesser's race; it had to be, the court felt, for "there is no other explanation for it on this record." Furthermore, the court concluded that Chesser's firing was a consequence of the discriminatory treatment he suffered during the review hearing. Had he been given a hearing the same as Deason's, the court believed, Chesser would not have been fired.

Based on these findings, the court entered judgment against the defendants[5] for intentionally discriminating against Chesser. It later awarded back pay to Chesser in the amount of $114,843.61, the court computing this amount without a reduction for a "window" period during which Chesser purportedly pursued his discrimination claim with less than the requisite enthusiasm and without a reduction for certain wages earned by Chesser since the time of his discharge from the ISP. This appeal followed.

ment. *McDonnell Douglas, supra.* If the defendant carries this burden of production the presumption created upon the establishment of plaintiff's prima facie case " 'drops from the case.' " *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). Plaintiff must then persuade the trier of fact by a preponderance of the evidence that he is a victim of intentional discrimination, defendant's reason for the disparate treatment being nothing more than mere pretext. *McDonnell Douglas, supra,* 411 U.S. at 804, 93 S.Ct. at 1825.

With this system "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093. The only thing subject to change is the sufficiency of plaintiff's proof. Evidence that will establish liability when the defendant remains silent will not necessarily do so when the silence is properly dispelled.

## I.

The defendants challenge the district court's holding that Chesser proved they intentionally discriminated against him on the basis of race. They attempt to show that this holding is erroneous by attacking its factual underpinnings. This attack concentrates on three findings of the lower court: (1) that the review hearing afforded Chesser was different than that afforded Deason; (2) that the reason the review hearing afforded Chesser was different was because Chesser was black; and (3) that the differences in the review hearing caused Chesser's termination. The defendants assert that these conclusions are faulty; that, in fact, they are the very opposite of truth.

■ Such an appellate argument faces a substantial hurdle at the outset. In a disparate treatment case such as this one the factual findings of the district court are subject to review under a clearly erroneous standard. *E.E.O.C. v. Sears, Roebuck & Co.,* 839 F.2d 302, 309 (7th Cir.1988). Those findings will stand if plausible, if they are supported by evidence or inferences which avoid the realm of nonsense. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Ratliff v. City of Milwaukee,* 795 F.2d 612, 617 (7th Cir.1986). For the defendants to prevail their argu-

4. This included evidence that Chesser was black and Deason white; that Chesser's qualifications and job performance was comparable with Deason's; that Deason's probationary employment was extended; and, that Chesser's probationary employment was not. For the standards relating to prima facie cases of racial discrimination generally, *see McDonnell Douglas, supra,* 411 U.S. at 802 & n. 13, 93 S.Ct. at 1824 & n. 13.

5. The district court later decided, *sua sponte,* that Title VII liabilities could not reach Pittman, for he was not an employer or a prospective employer, and, moreover, that a judgment entered against the ISP was the same as a judgment entered against the State of Illinois. Consequently, the district court's judgment went against one defendant only—the State of Illinois. For the sake of convenience and continuity, however, the word "defendants" will continue to be used in reference to the State.

ments must leave us "with the definite and firm conviction that a mistake has been committed" by the district court. *Anderson, supra,* 470 U.S. at 573, 105 S.Ct. at 1511 (*quoting United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). In other words, they must convince us that what the district court finds to be true is definitely not.

 This they have not done. The defendants' challenge to the district court's finding of differences between Chesser's and Deason's review hearings falls entirely short of establishing error. This is so because the record is replete with evidence showing substantial differences in the two hearings, as our summary of the facts quite clearly shows. The reality of these differences is amply supported. The district court's recognition of them, therefore, cannot constitute clear error. The defendants' challenge to the district court's finding that Chesser's race motivated these differences similarly falls short. At trial Chesser's race was the only explicit fact proffered into evidence by either adversary to explain the ill treatment he received in the hands of his reviewers.[6] The inference of racial animus drawn by the court below, then, seems eminently reasonable. The defendants protest now that race was not the reason behind the deficiencies with which Chesser's hearing was imbued. But they fail to offer an alternative reason for us to consider.[7] Race remains all that explains Chesser's treatment during his review hearing. Therefore, the district court's finding on that point stands free from error.

The defendants' last challenge also fails to establish error. In mounting it the defendants try two tacks in an attempt to show as clearly erroneous the district court's finding of a causal connection between the review hearing and Chesser's discharge. On the first they assert that although there were differences in the review hearings given Chesser and Deason, the differences did not prejudice Chesser; thus, the different review hearing he received could not have caused his discharge. But this argument runs counter to the evidence at trial, first and foremost of which is the fact that Chesser and Deason went into their review hearings on similar footing and Deason emerged unscathed, while Chesser emerged unemployed. True it is, as defendants' point out, that no evidence was introduced directly showing that Chesser was prejudiced by the defendants' failure to review him under standard procedures. But this cannot preclude the district court from inferring such prejudice when, as here, the inference follows naturally from the evidence that has been introduced.[8] On their next tack the defendants assert that even if Chesser's review hearing was different from Deason's, and different in a manner unfairly prejudicial to Chesser, it failed to cause his discharge because he would have been discharged regardless of the differences. This is so, argue the defendants, because Chesser was simply unqualified to remain in the ISP. Unfortunately for the defendants, this assertion suffers from a lack of force. The trial evidence does not prove that Chesser was unqualified to remain with the ISP. It only establishes that Chesser had a less

---

**6.** We do not mean to suggest that the defendants offered no exculpatory evidence explaining Chesser's discharge. That they did, and plenty of it. Our point dwells on the lack of exculpatory evidence explaining Chesser's different treatment at the review hearing. Our consideration here is not, "Why was Chesser terminated?" (which we address later), but, "Why was Chesser treated differently during his review hearing?"

**7.** The defendants' brief contains an initial complaint that the district court's finding of racial animus is in error, but then fails completely to develop the point by argument or otherwise.

No facts are alluded to that bear on the question of a race or nonrace motivation for the different review hearings and no cases are cited with import in this area.

**8.** We do not mean to imply that our decision in this case rests on whether Chesser was afforded due process in his review hearing. It does not. Rather, it rests on the existence of significant differences in treatment afforded the two troopers and on the deviation from usual practice during Chesser's review hearing, from all of which the trial court could reasonably draw the inferences it did.

than stellar performance record as a probationary trooper. But, then again, so did Deason.[9] And since Deason was retained as qualified despite this fact, the strong suggestion from the evidence is that Chesser should have been retained as well. The district court decided to look elsewhere than Chesser's qualifications for a reason for his discharge. We cannot say that its decision was in error.

The district court's holding that Chesser was a victim of intentional racial discrimination must stand. Accordingly, we uphold the district court's judgment adjudicating the defendants liable for violating Title VII.

## II.

■ This leaves us with the issue of back pay. The defendants are satisfied with the type of remedy the district court afforded Chesser, their complaint is with the amount—$114,843.61. They believe it should be considerably less. It is presently too high, they argue, because the district court's calculations are contrary to law.

The defendants point to two instances of alleged faulty reasoning on the part of the district court. In the first instance the court computed back pay over a period of time during which Chesser's discrimination complaint was pending before the EEOC or Justice and during which Chesser could have, but did not, file suit in federal district court, a period running from July of 1977 to April of 1982. The defendants believe

the court's computation was erroneous. They cite *Kamberos v. GTE Automatic Elec., Inc.*, 603 F.2d 598 (7th Cir.1979), *cert. denied*, 454 U.S. 1060, 102 S.Ct. 612, 70 L.Ed.2d 599 (1981) as authority for their position.

In *Kamberos*, a woman (Kamberos) sought a position as a corporate attorney with GTE, but GTE refused to hire her for the position because "they were looking for a man" to avoid what they believed, wrongly, was an eight-hour workday restriction on female employees. Kamberos filed a complaint with the EEOC against GTE on March 3, 1969. The EEOC brought the matter to the attention of GTE on March 27 and GTE immediately responded. On March 28 the company prepared a letter to Kamberos that contained an apology and a request for her resume. On April 2 the company filed a copy of the letter with the EEOC. There the letter, and the case, languished for over four years; no response to the company's attempt at reconciliation was forthcoming from either the EEOC or Kamberos. On January 3, 1974, the EEOC issued Kamberos a "right to sue" letter and she subsequently brought suit against GTE in federal court. The district court found GTE liable and awarded Kamberos back pay for a period of time including the period during which her complaint sat in cobwebs at the EEOC.

This Court reversed the district court's calculation of back pay. We noted that

---

**9.** It is true that the performance records and other evaluations of Chesser and Deason could have been construed in more than one way. Under one view, relying primarily on written evaluations of Chesser's and Deason's field work, the qualifications of the two troopers appear comparable. Under another view, relying more heavily on the trial testimony of various ISP officers, the qualifications of Deason appear better than those of Chesser.

This latter view is one that the district court, however, chose not to adopt. The making of such a choice does not result in error, for "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson, supra,* 470 U.S. at 574, 105 S.Ct. at 1511. The defendants claim, however, that the district court actually chose both views in the course of its opinion. Because relying on both views is in-

consistent, the district court's conclusion about their liability, they argue, must be in error.

But the district court did not choose both views. Its opinion relied only on the former. What it did do, however, was note that "[w]ere the only issue before us the respective evaluations of Deason and Chesser, defendants would prevail"; the court intimating that, without other evidence, Chesser would have failed in his proof. Of course, those respective evaluations were not the only evidence before the court. Other evidence existed, evidence that "Chesser did not receive a hearing comparable to that afforded Deason." The court's statement, then, was not a finding that Deason was qualified while Chesser was not, but merely a comment on "what might have been" had their review hearings been comparable. It was a hypothetical statement only, one that cannot give rise to an error-creating inconsistency.

Kamberos "permitted [her] complaint to *lie dormant* with the EEOC for over four years." *Kamberos, supra,* at 603 (emphasis added). This was so "despite the fact that EEOC regulations provide for the automatic issuance of [a] right to sue letter upon request of the complainant any time 180 days after the filing of the complaint with the EEOC." *Id.* Feeling that "the 'complainant should not be permitted to prejudice the employer by taking advantage of the [EEOC's] slowness in processing claims,'" *id.,* we deducted from the back pay period an amount of time equal to the time between 180 days after Kamberos filed her complaint and the date when she actually received a right to sue letter.

No such deduction should be made in this case, however, for it is wholly inapposite to *Kamberos.* The rule established there only applies in cases where the complainant's unexcusable conduct causes an unreasonable delay in the prosecution of the complaint. Here, however, the "delay" between Chesser's filing of the complaint with the EEOC and his filing of the complaint with the district court was not unreasonable, nor was his action in any manner unexcusable. The purpose of the *Kamberos* rule is to encourage action on the complaint. If action takes place the force of the rule is spent. Here action took place. Subsequent to filing, Chesser's complaint did not "lie dormant" with the EEOC: It was actively pursued by either that institution or the Department of Justice throughout the period of time until its arrival with the clerk of court. This case, therefore, lies without the purview of the *Kamberos* rule. Moreover, *Kamberos* has no application where the purported delay is unoccasioned by some fault of the complainant. In *Kamberos* the fault of the complainant was undeniable: the employer had made an immediate attempt at reconciliation (of which the complainant was presumably aware) and yet the complainant made no effort to respond. Here the fault, if any, for the alleged delay more properly lies with the ISP than with Chesser. Its dogged refusal to acquiesce to the EEOC's investigative requests certainly contributed to the length of time during which Ches-

ser's complaint was outstanding. Accordingly, the period of time upon which Chesser's back pay award was calculated should include the period of time before he received his right to sue letter. The district court's calculation included this time period. Thus, in this instance, its calculation was free from error.

■ The second instance of alleged faulty reasoning on the part of the district court occurred when it refused to take from Chesser's back pay award a deduction equal to an amount of certain wages earned by Chesser after his termination from the ISP. These wages—which totalled $35,418.15—were earned by Chesser in various "moonlighting" jobs in which he performed investigative services for the Hyatt Regency and Westin O'Hare hotels and the Cook County Sheriff's Department. As a state trooper Chesser would not have been allowed to moonlight in the above mentioned jobs, although he would have been allowed to moonlight in some other occupations, *e.g.,* grocery store clerk. The defendants assert that Chesser's moonlighting earnings constitute "interim earnings." Because Title VII mandates that "[i]nterim earnings ... [of] the person ... discriminated against shall operate to reduce the back pay otherwise allowable," 42 U.S.C. § 2000e–5(g), the district court erred, the defendants' argument runs, in failing to deduct an amount equal to these wages from the amount of back pay awarded Chesser.

The question to be answered, of course, is, "What does the phrase 'interim earnings' mean?" Both Chesser and the defendants seem to agree with the proposition that "interim earnings" means "wages (or the like) earned by a discriminated upon employee in the period after his discharge but before judgment that, but for the discrimination, would not have been earned." This agreement is implied from Chesser's and the defendants' supporting citation to numerous decisions the opinions of which apply the same or a similar formula. *See, e.g., Bing v. Roadway Express, Inc.,* 485 F.2d 441, 454 (5th Cir.1973). Their point of departure concerns the meaning of "wages

(or the like) earned … that, but for the discrimination, would not have been earned." Chesser prefers a meaning that excludes wages actually earned from jobs that would have been "prohibited" pre-discharge if a similar amount of wages could have been earned in a job that would not have been so prohibited. Thus, although Chesser would not have been allowed to work at the secondary investigation jobs had he still been employed at the ISP, he still would be entitled (in addition to his back pay) to the amount of earnings from those investigation jobs if he could *hypothetically* have earned as much in some non-prohibited job, such as a grocery store clerk. The defendants prefer a meaning that includes wages actually earned from jobs that would have been prohibited pre-discharge, even if a similar amount of wages could have been earned in jobs not so prohibited. So, in a case such as this one, where Chesser could not have worked secondary investigation jobs if he had stayed with the ISP, all wages earned by Chesser in such jobs after his termination must be deducted from his back pay award regardless of his ability to work in other jobs such as that of grocery store clerk.

Our preference lies with certainty. Thus, we adopt the defendants' position. "Interim earnings" includes the earnings from jobs that could not have been worked had no discrimination occurred. Where an employee accepts a job that he could not have taken if he remained in his old employment, the earnings from that job are interim earnings. This is so regardless of the availability to him of employment in "permissible" jobs not actually chosen. This interpretation suits the plain words of the statute, and comports most closely with our understanding of *Bing* and its progeny. It also avoids forcing courts and litigants to devote countless hours in hypothetical speculation about what an employee might have earned.

The discrimination against Chesser in this case caused him to lose economic advantage in the amount of $114,843.61. But it also allowed him to take jobs that would otherwise have been foreclosed to him and gain "interim earnings" of $35,418.15.

Thus, the proper amount of back pay to fulfill the goal of Title VII—compensation for the employee, not punishment for the employer—is the net of these amounts: $79,425.46. The district court's calculation of back pay failed to arrive at this amount because the district court failed to deduct Chesser's interim earnings. To the extent of that failure, the district court's calculation was in error.

The judgment of the district court on liability is AFFIRMED. Its judgment on damages is REVERSED, and the case is REMANDED for entry of judgment in an amount consistent with this opinion.